**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| IN RE: DIAL COMPLETE MARKETING | ) | |
| AND SALES LITIGATION | ) | Case No. 11-md-2263-SM |
| | ) | MDL No. 2263 |
| | ) | |
| This Memorandum Applies to: | ) | |
| ALL ACTIONS | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
<u>AMENDED MOTION FOR CLASS CERTIFICATION</u>**

Dated:  June 24, 2016

## INTRODUCTION

Plaintiffs filed their initial class certification motion [ECF No. 57] on November 16, 2012.  On December 8, 2015, this Court entered an Order [ECF No. 196] (the "Order") denying Plaintiffs' initial class certification motion because Plaintiffs "have not yet demonstrated that damages can be calculated on a classwide basis, and therefore have not met Rule 23(b)(3)'s requirements,"  Order at 106, and further stating that "[g]reater detail is essential to the valid assessment of the feasibility of plaintiffs' proposed methodology."  Order at 102 (footnote omitted).  The Court then permitted Plaintiffs to "file an amended motion for class certification, specifically addressing those deficiencies discussed in this order related to . . . their methodology for computing damages on a classwide basis."  *Id.* at 106.[1]

Accordingly, both herein and through the attached Expert Report of Stefan Boedeker (Exhibit A hereto, "Boedeker Declaration" or "Boedeker Decl."), not only do Plaintiffs

---

[1]  The Court also permitted Plaintiffs to move to substitute a plaintiff who can adequately represent the putative Louisiana class and address the deficiencies discussed in the order related to Plaintiffs' claim under the Ohio Deceptive Trade Practices Act, O.R.C. §§ 4165.01, *et seq.* (the "ODTPA").  Plaintiffs are unable to move to substitute a plaintiff to adequately represent the putative Louisiana class at this time and, therefore, voluntarily dismiss their Louisiana claims.

Plaintiffs respectfully request that this Court defer decision on whether consumers have standing to pursue an ODTPA claim.  This Court has already held that Plaintiffs' Ohio Consumer Sales Practices Act and Ohio Breach of Express Warranty claims are certifiable.  *See* Order at 75-79.  This Court has also correctly noted that there is no binding authority resolving whether consumers have standing to pursue an ODTPA claim.  *See McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 749 (N.D. Ohio 2010) (noting split between courts in the Northern District of Ohio and the Southern District of Ohio on the question of who has standing to file suit under the ODTPA, denying motion to dismiss claim, and finding that it is "that it is necessary to certify this issue to the Ohio Supreme Court."); *Blankenship v. CFMOTO Powersports, Inc.*, 944 N.E.2d 769, 777 (Ohio Ct. of Common Pleas Jan. 24 2011) (noting that although the federal district court in *McKinney* found it necessary to certify the issue to the Ohio Supreme Court, the plaintiff voluntarily dismissed the ODTPA claim and for that reason the conflict, and holding consumers lack standing under ODTPA); *but see Schumacher v. State Auto. Mut. Ins. Co.*, 47 F. Supp. 3d 618, 632 (S.D. Ohio 2014) (disagreeing with *Blankenship* and holding "that an individual consumer does have standing to sue under the ODTPA").  Thus, any decision on the issue of consumer standing to assert an ODTPA claim would likely be appealed, and because the same Ohio class would seek trial over the same genuinely disputed issues of fact with or without a decision on the ODTPA claim, attempting to resolve the disputed issue of ODTPA consumer standing prior to trial would be of limited value in this case.  In such circumstances, Plaintiffs respectfully submit that reserving judgment on consumer standing under the ODTPA claim would be the more efficient and appropriate course.

demonstrate precisely how damages can be calculated on a classwide basis – through a conjoint analysis methodology – but Plaintiffs also provide the Court with the precise type of detail with respect to that methodology that the Court requested in its December 8 Order. Plaintiffs retained Boedeker to determine whether any specific economic techniques could determine whether Plaintiffs and the other Class members had been deprived of a measurable monetary portion of the benefit-of-the-bargain they had struck with Dial by buying Dial Complete with a superior efficacy claim on the label but, in fact, receiving a product that did not provide the promised superior efficacy.  Not only did Boedeker complete this task by describing a well-developed and widely-accepted conjoint analysis methodology, but Plaintiffs have far exceeded what is required at the class certification stage by not only describing that methodology, but also by having Boedeker execute it to calculate the aggregate damages caused by Dial's challenged "Kills 99.99% of Germs" claim.

Given Plaintiffs' detailed articulation of their proposed damages methodology and their demonstration of how that methodology satisfies *Comcast*[2] and establishes damages with common proof, this Court should grant Plaintiffs' amended class certification motion and allow Plaintiffs to proceed to trial so that they may prove to a jury that Dial Complete's health benefits promises were false and damaged Plaintiffs and the other Class members.

## <u>ARGUMENT</u>

### A.  Plaintiffs Have Already Satisfied Ascertainability, Rule 23(a), and Rule 23(b)(3) with Respect to Determining Dial's Classwide Liability

The Court has already ruled in Plaintiffs' favor with respect to ascertainability,[3] all four

---

[2] *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433 (2013).  *See* p. 10, below.

[3] *See* Order at 20 ("In sum, the plaintiffs' proposed class definition is 'not vague,' and it adequately 'identifies a particular group of individuals' (purchasers of Dial Complete).  The plaintiffs' proposed classes are defined by objective criteria – whether the potential class members purchased Dial Complete containing the challenged claims on the packaging during a fixed time period – and the potential class members can be feasibly identified by sworn affidavits of purchase, among other methods.  The

Rule 23(a) prerequisites,[4] and the Rule 23(b)(3) superiority and predominance requirements

with respect to liability.[5]   Accordingly, Plaintiffs do not re-address these issues herein.

Instead, Plaintiffs incorporate by reference their prior briefing on these issues [*see* ECF Nos.

57, 120, and 161], to the extent such incorporation is required.

> **B.     Plaintiffs Will Calculate Classwide Damages Through a Conjoint Analysis Methodology Described and Executed by Stefan Boedeker.**

As Boedeker explains in his Declaration, a multi-step conjoint analysis methodology

can be used to determine whether Dial's false and deceptive marketing statements (specifically,

Dial's "Kills 99.99% of Germs" claim) caused a price premium on Dial Complete, to quantify

that price premium, and to calculate the resulting total dollar value of class-wide damages.  The

conjoint analysis methodology is comprised of three steps: data collection, data analysis, and,

finally, damages calculation.  Each of these steps is explained further below.

> **a.   Data Collection:  The Conjoint Analysis Methodology Starts With Basic Market Research, Culminating in Implementation of a Well Designed, Choice-Based, Conjoint Survey To Collect Data.**

The first step of conjoint analysis that Boedeker undertook was data collection.

Initially, Boedeker conducted preliminary background research to understand the consumer

---

plaintiffs have not impermissibly created a 'fail-safe' class, a class 'defined in terms of success on the merits.'  Consequently, the classes are sufficiently ascertainable to warrant class certification.") (citations and footnotes omitted).

[4] *See* Order at 21 ("[T]he class is sufficiently numerous to satisfy Rule 23(a)."); *id.* at 23 ("In this case, plaintiffs have identified four questions of law or fact common to potential class members[.]"); *id.* at 26 ("Because the named plaintiffs' claims arise from the same alleged misrepresentations on the packaging of Dial Complete as those of the potential class members, they are typical of the alleged class claims."); and *id.* at 27-29 ("class counsel satisfies the adequacy requirement" and "the named plaintiffs are sufficiently cognizant of the claims and issues in this case to serve as named plaintiffs").

[5]  *See* Order at 34 ("With respect to manageability, there is no evidence that this consumer class action will be any more difficult to manage than any other consumer class action.  Consequently, given the large number of potential class members and small value of individual claims, not only is a class action the superior method of resolving this case, it is the very sort of case for which the Rule 23(b)(3) class action mechanism was intended."); *id.* at 90 ("The state law claims at issue here raise common questions as to whether Dial materially misrepresented Dial Complete's efficacy and misled reasonable consumers. . . . The court therefore concludes that the plaintiffs have sufficiently established the predominance of common issues of liability.").  *See also* Order at 106 ("In sum, plaintiffs have satisfied Rule 23(a)'s requirements, and Rule 23(b)(3)'s superiority requirements.").

market for liquid hand soap products and the wide variety of liquid hand soap attributes available in the marketplace.  Based on that basic background research, Boedeker developed a Choice-based Conjoint Analysis ("CBC") survey to measure consumer preferences regarding several attributes of consumer hand soaps including the challenged "Kills 99.99% of Germs" claim found on the label of every bottle of Dial Complete.  He then retained a survey company to run the CBC survey in a relevant population sample of 2,000 respondents and from those respondents collected 18,000 price-attribute consumer preference CBC data points.

### i.  Boedeker Conducted Background and Market Research.

Boedeker's background research involved reviewing a broad range of materials including the Consolidated Amended Complaint, Dial's Answer, and the initial round of class certification briefing and exhibits.  Boedeker Decl. § 3.  Boedeker's background research also included review of market research data from Mintel (a global market research and market insight company) and field observations, *i.e.*, observing the characteristics of the wide variety of liquid hand soap products available for purchase both online and in retail stores.  Boedeker Decl. § 4.  This background research helped Boedeker understand the nature of the consumer liquid hand soap market, its competitive landscape, and the wide variety of liquid hand soap choices available to consumers.  Boedeker's review of this material also helped him observe how some liquid hand soap health claims appeared uniquely on some products (like the "Kills 99.99% of Germs*" and "#1 Doctor Recommended" claims found on Dial Complete), while other claims (such as "antibacterial") appeared on the labels of other Dial products (*i.e.*, products other than Dial Complete, like "Dial Gold") and competitors (*i.e.*, Softsoap Antibacterial and a large number of store brand "private label" products), while yet other claims (such as "wash away bacteria," found on certain Softsoap products) appeared only on the labels of non-Dial competitors and not on Dial products.  Boedeker Decl. § 4.   This

research contributed to Boedeker's knowledge of consumer liquid hand soap differentiating attributes, including emphasis on different kinds of efficacy claims, the variety of scents, colors, styles, and packaging available on store shelves, the promotion of foaming and moisturizing properties, and the existence of a wide variety of competing "name" brands and "private label" store brands within a relatively steady range of unit sizes and prices.  *Id.*

### ii.  Boedeker Designed a CBC Survey Based on His Research.

Armed with this background research, Boedeker developed "an economic loss model to quantify damages suffered by the proposed class attributable to the purchase of a product that does not have the attributes as advertised."  Boedeker Decl. ¶ 7.  Based on Boedeker's expert knowledge in the field of economics and his understanding of fundamental economic principles that price in a competitive market is set by the intersection of supply and demand curves, Boedeker focused on measuring how the revelation of the falsity of Dial's "Kills 99.99% of Germs" claim would have affected demand for Dial Complete and how failing to provide a promised attribute deprived consumers of utility and caused them to have paid an artificially higher price – also known as a "price premium" – for Dial Complete than they otherwise would have paid had Dial not made its false, deceptive, and misleading "Kills 99.99% of Germs" claim.  Boedeker Decl. § 5.[6]  As this Court noted in the Order, this understanding of the price premium – the "'amount of money consumers pay to acquire an attribute of a product'" as opposed to a "premium over competing foaming soaps without

---

[6] As explained in further detail below, Boedeker's methodology includes determining consumer willingness-to-pay (*i.e.*, demand) for the specific "Kills 99.99% of Germs" Dial Complete product attribute through a CBC survey, but does not end there.  Boedeker's analysis goes further and uses market simulations to demonstrate how that attribute, for which there is measureable consumer willingness-to-pay, was responsible for a portion of Dial Complete's total market price (*i.e.*, the "price premium").  Because Dial did not actually provide the "Kills 99.99% of Germs" attribute Dial promised, calculating class-wide damages based on the price premium caused by the false claim is just and proper and can be undertaken using common proof.

similar germicidal claims – is "persuasive."[7]

Plaintiffs focused on measuring consumer demand related to the "Kills 99.99% of Germs" claim (as opposed to the deceptive "antibacterial" express claim or the false "superior efficacy" implied claims) for a number of important reasons.  First, the "Kills 99.99% of Germs" claim is an express claim and product attribute unique to Dial Complete.  Second, Dial's "Kills 99.99% of Germs" claim is literally false, as well as deceptive and misleading.  Third, as this Court previously held, the "Kills 99.99% of Germs" claim conveys the same false message about Dial Complete as did Dial's other pre-2008 Dial Complete express label claims including "Superior Germ Kill," "10x More Effective Germ Kill," and "Kills 10x More Germs."[8]

In order to measure consumer demand (also known as "willingness-to-pay") for the "Kills 99.99% of Germs" label claim attribute on Dial Complete, and the corresponding loss of utility and monies paid by the Class for Dial Complete due to that promised attribute having not actually been provided, Boedeker used the well-accepted "Stated Preference"-based approach of "conjoint analysis" to estimate the "part-worth" of the "Kills 99.99% of Germs" claim as a part of the total price of a liquid hand soap.  Boedeker Decl. § 5.4.

To collect the data needed for this conjoint analysis, Boedeker developed a "Choice

---

[7] *See* Order at 96 n.25 (quoting Burke and Rosen Rebuttal Report, [ECF 162-4]); *see also Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 890 (Cal. 2011) ("For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately.").

[8] *See* Order at 45 n.12 ("Dial correctly points out that it made different specific claims about Dial Complete at different points in time.  However, that the exact language Dial used to promote Dial Complete was modified over the years does not alter the fact that the message Dial conveyed about Dial Complete was uniform and consistent: that Dial Complete provided a greater health benefit to consumers than ordinary liquid hand soap.  And, that allegedly deceptive message is at the core of plaintiffs' claims.  That the allegedly deceptive message was worded slightly differently over a period of years does not preclude a finding that common issues predominate.") (citations omitted).

Based Conjoint" ("CBC") consumer survey where survey participants are shown product profiles with different levels of various attributes, including particularly, the "Kills 99.99% of Germs" attribute of interest here, and asked to indicate their preferences for these profiles by selecting between them. Boedeker Decl. ¶ 58-68. A full copy of the survey is appended to Boedeker's Declaration, as Appendix A-2 to Exhibit A.[9]

The specific liquid hand soap attributes included in Boedeker's CBC survey were "Kills 99.99% of Germs," "Antibacterial," "Foaming," and "Moisturizing" (all of which had binary levels of either present or absent) and a fifth attribute of price (which was set at nine price point levels ranging from $0.99 to $3.99 to reflect real world observed prices in the liquid hand soap marketplace). Boedeker Decl. ¶ 64; *see also id.* ¶ 23. With four binary attributes levels and nine price point attribute levels, the survey created 144 distinct possible "choice sets" that survey respondents would be asked to choose among. *Id.* ¶ 66. In order to control for the fact that there are numerous other characteristics of liquid hand soaps and to prevent survey participants from assigning value to these unstated attributes not explicitly mentioned in the choice sets, the survey specifically instructed respondents to assume that the choice sets they were asked to choose between had "all the other features and characteristics (such as brand, scent, color, shape, etc.) that you prefer." *Id.* ¶¶ 65 and 67.[10]

---

[9] In addition to the CBC exercise portion of the survey, the survey questionnaire also included demographic qualifying questions as well as other non-CBC exercise survey questions to elicit respondents' thoughts about liquid hand soaps and gather background data on where they buy liquid hand soap, which brands they typically buy, and which qualities are important to them in making purchasing decisions. Boedeker Decl. ¶¶ 71-72.

[10] Boedeker designed the survey to adhere to proper survey design criteria in that it was balanced, orthogonal, and avoided order bias by randomizing the order in which the attributes in each choice set were set displayed. Boedeker Decl. ¶ 66 and 68. By designing the CBC survey in this manner, Boedeker maximized the survey's efficiency and its ability to produce statistically significant data with calculable error rates. *Id.*

### iii.  Boedeker Retained A Survey Company to Obtain 18,000 CBC Data Points from 2,000 Qualifying Survey Respondents.

In January 2016, Boedeker retained Amplitude Research ("Amplitude") to program and host his CBC survey online and obtain responses.  Boedeker Decl. ¶ 69.   Boedeker directed Amplitude to target a demographically diverse group of survey respondents.  *Id*. ¶ 70.  In order to qualify to take the CBC survey, Boedeker required that the survey respondent be at least eighteen years old, reside in the United States, and have purchased liquid hand soap within the last twelve months.  *Id*. ¶ 63 n. 21.   By setting respondent qualifications in this manner, Boedeker ensured that survey respondents would match most closely the characteristics of class members, all of whom also live in the United States and all of whom had previously purchased liquid hand soap.  *Id*. ¶ 62; *see also* [Proposed] Order Granting Amended Motion for Class Certification (proposing class definitions).

Amplitude collected CBC data from 2,000 qualifying respondents.  Boedeker Decl. ¶ 70.  Approximately 45% of the survey respondents were male and 55% female.  *Id*.  The respondents represented a wide range of ages, incomes, and places of residence.  *Id*.  When asked which brands of liquid hand soap they purchased in the last twelve months, given a menu of fifteen choices including major brands, "store brand," and a fill-in-the-blank "other" option, approximately 60% of the respondents indicated that they had purchased a "Dial" branded liquid hand soap in the past and 19% indicated they purchased Dial brand most often.  *Id*. ¶ 71. Survey respondents were not asked to identify which particular liquid hand soap products (*i.e.*, Dial Gold, Dial Complete, Softsoap Aquarium Series, Softsoap Foaming, etc.) they purchased and the survey was crafted to not inadvertently reveal its sponsor or specific subject of study. *Id*. ¶ 67 n. 29.

Each of the 2,000 qualifying survey respondents was asked to complete the CBC

exercise.  Survey respondents were shown four of the 144 possible choice set combinations, as well as a fifth "none of the above" opt-out choice, and were asked to select one of these five choices in order to reveal their preferences for various features in liquid hand soaps.  Boedeker Decl. ¶ 65.  Each survey respondent was asked to repeat this choice exercise on different choice sets a total of nine times.  *Id*. ¶ 64.  As a result, from the 2,000 qualifying survey respondents, Boedeker collected a total of 18,000 CBC data points reflecting consumer preference for consumer hand soap attributes ready for well-established statistical and econometric analysis.  *Id*. ¶ 76.

> **b.** **Data Analysis**:  **The Conjoint Analysis Methodology Progresses To Statistical and Econometric Analysis of The Raw Data Collected Through the Choice-Based Conjoint Survey to Estimate the Portion of Dial Complete's Historical Price Specifically Attributable to the Challenged "Kills 99.99% of Germs" Claim.**

With 18,000 CBC data points in hand, Boedeker analyzed the data.  Boedeker's analysis consisted of:  (1) using well-accepted econometric and statistical estimation techniques specifically based on mixed logit models and Hierarchical Bayesian Estimation techniques to quantify consumer willingness-to-pay for a true "Kills 99.99% of Germs" product attribute on a liquid hand soap;[11] (2) running computer-based market simulations to convert willingness-to-pay into actual market value price premium; and, (3) calculating the difference in equilibrium market value price premium between a hand soap labeled "Kills 99.99% of Germs" and a hand soap labeled "antibacterial" to specifically isolate the premium caused by the literally false claim Plaintiffs challenge in this case.  *See generally* Boedeker Decl. § 8.

By isolating this "Kills 99.99% of Germs" premium, Boedeker was able to measure what the equilibrium market price for Dial Complete *would have been* in the but-for world that

---

[11] Mixed logit models and Hierarchical Bayesian Estimation techniques are both well-accepted econometric tools based on statistics.  Boedeker explains these tools in section 8.2 of his Declaration.

*could* have existed had Dial not lied to consumers by placing the "Kills 99.99% of Germs" label claim on Dial Complete, ensuring that Plaintiffs' proposed damages model is specifically tied to their liability theory, thus readily satisfying *Comcast*. *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1433 (2013) (holding that plaintiffs must tie their damages theory to their liability theory, that their damages theory must be subject to calculation by a "common methodology," and that the damages theory be sufficiently described so that the district judge may perform "rigorous analysis" of it).  This figure, that Plaintiffs and economists refer to as a "price premium," is the portion of Dial Complete's overall purchase price attributable to Dial Complete's purported superior efficacy properties that Dial promised, but failed, to provide and is a proper measure of classwide damages here.  *See Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 n.2 (S.D. Fla. 2010) ("Ostensibly, a deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice.  Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have.  Consequently, the consumer suffers damages."); *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 63 (E.D.N.Y. 2015) ("the injury is the price premium on every product sold"); *Rollins, Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984) ("[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered according to the contract of the parties") (citation and quotation omitted).  As previously noted, this Court has already accepted this "price premium" concept here.  *See* Order at 96 n. 25.

The details of Boedeker's statistical and econometric analyses of the raw data are found in section 8.3 of his Declaration.  In summary, Boedeker's analysis reveals the "part-worth" of the "Kills 99.99% of Germs" claim as a portion of the total price of Dial Complete by making

inferences and observations from the large data set of CBC data points he gathered in the prior

step of conjoint analysis.  The resultant "Kills 99.99% of Germs" price premium as determined

by Boedeker's analysis is *not* the simple average of what a group of 2,000 respondents said the

claim "Kills 99.99% of Germs" is worth based on no more than those respondents' subjective

opinions about that claim.  Rather, the premium is based on statistical analysis of the survey

responses and depends on calculations of the *probability* that any one CBC data point (that is,

the choice made by one survey respondent amongst five options) is consistent with an assumed

distribution of an infinite universe of data points pursuant to assumed distribution (which could

be, but in this analysis not necessarily is, something like a bell curve or a logarithmic random

utility scale) for the value each respondent assigned to the product features being analyzed,

including the claims "Kills 99.99% of Germs" and "antibacterial."

        After first conducting analyses of each of the 2,000 respondents to create estimates of

their preferences for various product attributes, the well-accepted statistical techniques widely

employed in conjoint analysis then *simulate* a liquid hand soap market involving two

hypothetical products – a basic product without the attribute and a "premium" product with the

attribute added – over and over again in order to, after thousands of iterations, converge on the

*true market value* of the claims being studied as opposed to the individual respondent's

expressed value or the average of all the individual respondent's expressed values.  Figure 9 in

Boedeker's report provides a brief encapsulation of how the market simulation works. *See*

Boedeker Decl. ¶¶ 94-95.  In a marketplace comprised of two products, one "premium"

product labeled "Kills 99.99% of Germs" and one "basic" product without the label but with a

"Moisturizing" claim, if both products were equally priced at $0.99, 73.3% of the participants

in the market for liquid hand soap would choose the "Kills 99.99% of Germs" product, 15.5%

would chose the basic "no claim" product, and 11.2% of consumers would not purchase either

product.  *Id.*  As the price of the premium "Kills 99.99% of Germs" product increases, the

percentage of market participants selecting the premium product decreases and the percentage

choosing the basic product, which remains at a fixed set price, increases.  *Id.*  As the price of

the premium product in the model continues to rise, a price point for the premium product is

reached at which the market share of the premium product (at the higher price) and the market

share for the basic product (at the constant price) become equal.  *Id.*  At equilibrium market

share, the market price of the premium product was $2.88 and the market price of the basic

product was $2.24.  *Id.*  The difference in price between the basic product and the premium

product at this equilibrium market share point, here, $0.64, is according to the science of

economics, the true market value of the claim "Kills 99.99% of Germs" as compared to a basic

product without the germ claim and with a "Moisturizing" claim.

But Boedeker did not stop there.  In order to focus specifically only on the price

premium caused by the literally false and challenged "Kills 99.99% of Germs" claim,

Boedeker conducted a second market simulation between a "premium" product bearing an

"antibacterial" claim and a "basic" product bearing a "Moisturizing" claim, and then compared

the price premiums caused by the antibacterial claim and the "Kills 99.99% of Germs" claim.

Boedeker Decl. ¶¶ 91-99.  Going through the same process as outlined above (determining the

price of the premium product at market share equilibrium and then subtracting the price of the

basic produce from the premium product at that equilibrium point), Boedeker determined that

the true market value premium of the "antibacterial" claim is $0.22, as compared to a basic

product without that claim but with a "Moisturizing" claim. *Id.* at ¶ 97, Figure 11.   By

subtracting the "antibacterial" premium (a product implicitly priced at $2.46 with 38% market

share) from the "Kills 99.99% of Germs" premium (a product implicitly priced at $2.88 with

38% market share), *id.*  at ¶¶ 95, 97, Figures 9, 11,  Boedeker is able to specifically isolate the

premium caused by the "Kills 99.99% of Germs" claim over and above an antibacterial claim,

thus eliminating any possibility that damages are being measured in a way inconsistent with

Plaintiffs' strongest theory of liability – that the "Kills 99.99% of Germs" claim is literally

false and should have never been made – ensuring compliance with *Comcast*.  Stated another

way, by measuring the *difference* in premium between "Kills 99.99% of Germs" (a literally

false claim) and "Antibacterial" (a literally true but still misleading claim), Boedeker has

guaranteed that this application of conjoint analysis only measures the true market value of

Dial's explicitly false claim without the complication of measuring the value of other attributes

of Dial Complete.

Finally, Boedeker determined the "Kills 99.99% of Germs" claim price premium

difference as both the average percentage of the total price of a hypothetical liquid hand soap

(*i.e.*, dividing the $0.42 price premium in the product bearing that claim by its implicit price of

$2.88 to yield an average price premium percentage of 14.57%) attributable to the false "Kills

99.99% of Germs" claim as well as the median based on over 900 price point simulations and

five base products with varying features.  *Id.*  at ¶ 100.  Boedeker concluded that the "median

value of 10.89% of the distribution of all simulations for the premium percentage is a reliable

estimate that can be used to derive class-wide economic losses by applying the median

percentage of 10.89% to the overall revenue from the sales of liquid hand soap products that

were sold with the false claim."  Boedeker Decl. ¶ 103.

> ### c. Damages Calculation:  The Conjoint Analysis Methodology Concludes By Applying the "Kills 99.99% of Germs" Price Premium to Dial's Actual Aggregate Sales Records of Dial Complete to Calculate Classwide Damages.

Third and finally, Boedeker explained how he could calculate classwide damages by

multiplying the median price premium percentage determined through the prior two steps –

here, 10.89% – to the total amount that consumers actually paid to purchase Dial Complete

during the class period.

Based on Dial's latest production of nationwide Profit & Loss summary data, Dial's *wholesale* net sales of Dial Complete from 2002 through the beginning of 2015 were

▇▇▇▇▇▇▇▇.  *See* Dial P&L Summary 2002 through YTD Jan 2016 (attached hereto at Exhibit B).  The retail dollar total consumers actually paid for ▇▇▇ million dollars' worth of wholesale Dial Complete can be obtained, with great expense, from third-party "scanner data" tracking companies like IRI and Nielsen.  Alternatively, the total dollar amount consumers spent to purchase ▇▇▇ million of wholesale Dial Complete can be estimated by multiplying the wholesale price by a reasonable and typical retail markup determined from Dial's own records and the retail price averages reflected in scanner data already produced and to be obtained through the course of further merits discovery after class certification is granted.[12] Thus, based *solely* on wholesale figures, Class members paid at least 10.89% of ▇▇▇ million (or ▇▇▇▇▇▇) for benefits Dial promised but never provided, as determined by Boedeker's analysis of conjoint survey data, calculation of a "Kills 99.99% of Germs" price premium, and application of that price premium to the wholesale dollar amount of Dial Complete sales. Indeed, given that Dial's own records establish that Dial obtained gross profits of ▇▇▇▇▇▇▇▇ based on wholesale sales of ▇▇▇▇▇▇▇ of Dial Complete, Boedeker's damages calculation appears more than reasonable, in that it is only a third of the profits Dial obtained in part by making a superior efficacy promise that Dial, in fact, never provided.

In sum, Boedeker's conjoint analysis methodology, as described in detail and actually executed by Boedeker, provides a clear and detailed roadmap for how Plaintiffs can calculate damages on a classwide basis with common proof.

---

[12] As noted herein, these are nationwide figures as opposed to figures reflecting Dial's sales to stores solely within the Class states of Arkansas, California, Florida, Illinois, Missouri, and Ohio.  Nationwide figures can be broken down state-by-state by reference to Dial's internal records, the records of scanner data companies, or by U.S. Census data.

**C.      Use of Conjoint Analysis is Legally Sound Under the Facts of This Case.**

As this Court previously noted, it is "clear in the First Circuit that '[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself.'"  Order at 97-98 citing *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. at 183 (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009) (citing 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10.5, at 483-86 (4th ed. 2002) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages....")))[13]  The Supreme Court also recently reaffirmed that use of such "representative evidence" can be a "permissible means" of making a showing of proof in a class action.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 (2016) ("In a case where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class.").  Here, representative econometric evidence – the results of the conjoint analysis methodology – is appropriately being used to establish economic injury and calculate damages in the same way it would be used in an individual action arguing that the individual overpaid for Dial Complete

---

[13] While Dial, in attacking Plaintiffs' satisfaction of the Rule 23 standards, will likely contend that different individuals have different preferences or reasons for purchasing Dial Complete.  That contention, however, is irrelevant, because individuals do not set the price of Dial Complete, the market as a whole does.  Similarly, Dial's anticipated contention that some individuals would have paid the same amount regardless of Dial Complete's superior efficacy claims is also misplaced because those individuals have no ability to individually negotiate the price they paid for Dial Complete.  Furthermore, as this Court already noted, "to the extent that some class members were satisfied that any premium that they paid for Dial Complete 'was worthwhile,' those class members 'can opt out or decline to file for damages awarded to the class.'"  Order at 89 (citation omitted).  Indeed, in *Sanchez-Knutson*, the court definitively rejected the defendant's demands that the class proponent "know what any individual class member paid" in order to properly use a conjoint analysis damages methodology.  *See Sanchez-Knutson v. Ford Motor Co.*, No. 14-61344-CIV, 2016 WL 1658801, at *5 (S.D. Fla. Apr. 6, 2016) (rejecting challenge based on allegation that expert "does not know what any individual class member paid for the vehicle" because there was "voluminous pricing evidence provided by [Defendant] in the course of discovery which it plans to present at trial, so that the jury can apply [the expert's] conjoint analysis to the class.").

and should be compensated.

As this Court also previously noted, use of conjoint analysis to calculate classwide aggregate damages is legally proper and permitted under appropriate circumstances. *See* Order at 103-104.   Numerous other courts have similarly endorsed the use of a sufficiently described conjoint analysis methodology in similar circumstances. *See Sanchez-Knutson v. Ford Motor Co.*, No. 14-61344, 2015 WL 6395040, at *7 (S.D. Fla. Oct. 6, 2015) (rejecting as "unfounded" argument "that conjoint analysis, an analytic survey method used to measure customer preferences for specific features of products, is an improper damages theory post-*Comcast*"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015) (accepting expert testimony that expert "will isolate the premium associated with the 50% thicker claim using one of three statistical methods: hedonic regression, a contingent valuation study, or a conjoint analysis."); *In re ConAgra Foods, Inc.,* 90 F. Supp. 3d 919, 1027 (C.D. Cal. 2015) (granting class certification and recognizing that "[c]onjoint analysis is regularly used in litigation to translate the 'relative importance' of a product feature into a price premium paid by consumers."); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082 (D. Minn. 2015) ("The Court finds that Gaskin's conjoint analysis is generally a permissible method for calculating damages."); *Guido v. L'Oreal, USA, Inc.*, No. 11-cv-1067, 2014 WL 6603730, at *11 (C.D. Cal.  July 24, 2014) (holding that plaintiff's expert's proposed conjoint analysis damages theory was not junk science, could be applied on a classwide basis for predominance purposes under Comcast, and was consistent with plaintiff's theory of liability).

Boedeker's use of conjoint analysis supports class certification here because it does far more than infer damages based on CBC survey results alone; rather, the conjoint analysis methodology employed here incorporates market simulations to reveal the actual amount of price premium caused by the challenged "Kills 99.99% of Germs" claim and then applies that

price premium to the actual supply of Dial Complete sold by Dial to calculate classwide

damages.  Where, as here, Dial has already produced evidence of Dial Complete's actual

wholesale sales figures, determining total classwide damages requires no more than

multiplying the price premium percentage with either one of those totals to arrive at a

reasonable and reliable measure thereof.  *See* Exhibit B; Boedeker Decl. ¶¶ 105-107.[14]

Indeed, the past supply of Dial Complete is fixed and determinable – Class members

have already purchased all the Dial Complete that Dial was willing to supply to the

marketplace and Dial knows exactly how much Dial Complete it sold during the Class Period –

there is no need to separately simulate supply in the supply and demand price function.[15]

Moreover, there is absolutely no evidence that the "supply" of Dial Complete would have

changed if Dial had not been allowed to make its false and misleading label claims.  Here, the

marginal cost of producing Dial Complete was so far below the actual average wholesale price

Dial charged for Dial Complete, that even if the total dollar value of "Kills 99.99% of Germs"

premium were subtracted from Dial Complete's price, given Dial's gross profits on Dial

Complete of ▮▮▮▮ million, Dial still would have made a profit selling Dial Complete without

---

[14] A calculation of classwide damages can be made based on retail sales figures once Dial produces that information.

[15] The patent cases in which courts rejected the use of conjoint analysis as a tool for calculating how much money a patent holder should be awarded due to a competitor's infringement are inapposite to the situation here.  In patent cases, the purpose of any economic methodology is not to measure the amount of harm inflicted on consumers by purchasing products with features they were promised but did not receive (indeed, in the short run, patent infringements are consumer boons in that they break the patent holder's ability to charge a monopoly price), but rather, the purpose is to hypothesize the sales the patent holder lost had the competitor never infringed. In such circumstances, it is far clearer why conjoint analysis on its own is insufficient in patent cases, as merely calculating how much less consumers would have paid for the infringer's infringing product does not demonstrate that the patent holder would have reaped its competitor's lost sales.  *Cf. Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-cv-01846-LHK, 2014 WL 976898, at *16 (C.D. Cal. Aug. 14, 2015) (patent infringement case in which conjoint based survey attempted to measure lost profits and lost sales, as opposed to overpayments on actually purchased products or disgorgement of infringer's profits, was rejected); *Oracle America, Inc. v. Google Inc.*, No. C 10-03561, 2012 WL 850705, at *10-11 (N.D. Cal. Mar. 13, 2012) (patent and copyright infringement case where the court found that "conjoint analysis in this particular instance is an unreliable predictor of market share").

the improper price premium.  *See* Exhibit B; *see also* Boedeker Decl. ¶ 102 ("Based on sales summaries I have reviewed the median premium percentage is well below the gross margin that Dial realized by selling the product with the false claim.").

Furthermore, Boedeker's use of conjoint analysis methodology is superior to the attempted use of that methodology in *In re NJOY, Inc. Consumer Class Action Litigation*, 120 F.Supp.3d 1050 (C.D. Cal. 2015).  First, and most importantly, unlike the plaintiff's expert in *NJOY*, whose conjoint analysis damages methodology was "entirely subjective and lack[ed] any market-based component," *id.*, at 1122, Boedeker's analysis, as noted above, includes computer simulated market studies in order to translate willingness-to-pay responses from the CBC survey data into the difference in implicit true market price that would have existed had Dial not lied.  *See* Boedeker Decl. § 8.  In other words, the CBC survey Boedeker developed and ran, in which data was collected on consumer preferences for various liquid hand soap attribute choice sets, was merely a first step in Boedeker's conjoint analysis methodology, not the end point.  Boedeker is not just asking consumers what they think a "Kills 99.99% of Germs" claim is worth and calling the average of consumer responses damages, he is using well accepted econometric and statistical techniques to simulate a market with the benefit of 18,000 preference data points to translate willingness to pay into true market value.  Second, the consumer hand soap market is far more mature and developed than the e-cigarette market, making use of conjoint analysis more appropriate here than it was in *NJOY*.  *See In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-428-JFW (JEMX), 2016 WL 787415, at *8 (C.D. Cal. Feb. 2, 2016) (noting use of Bayesian hedonic regression required "a stable market where the price of a product is set by a competitive equilibrium").[16]  Third, plaintiffs' expert in

---

[16]   Similarly, conjoint analysis ran into problems in *Saavedra v. Eli Lilly and Co.* because the court there held that "the prescription drug market is not an efficiently functioning market" and "the numerous complicating factors in the prescription drug market sever the relationship between price and

*NJOY* attempted to use conjoint analysis to establish whether omissions on product packaging, as opposed to affirmative misrepresentations, caused a price premium, further distinguishing use of conjoint analysis in *NJOY* from Boedeker's use of that methodology here. *See In re NJOY, Inc.*, 120 F.Supp.3d at 1084-1085 (C.D. Cal. 2015) (describing how case was about omission of information on label about ingredients and further omission of health risk warnings).[17]

In sum, the weight of the case law supports certifying the class here.

## CONCLUSION

Dial lied to consumers when it claimed Dial Complete "Kills 99.99% of Germs." Consumers paid more than they otherwise would have paid for Dial Complete because of that lie. Plaintiffs have developed, proposed, and actually executed a conjoint analysis damages methodology that measures, on a classwide basis using only common evidence, the total aggregate amount of classwide damages caused by Dial's lie. Accordingly, based upon the Court's December 8, 2015 findings with respect to the other Rule 23 requirements, coupled with the arguments set forth herein and in the supporting materials submitted herewith, this

---

value." *Saavedra v. Eli Lilly and Co.*, No. 2:12-cv-9366-SVW, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014). Unlike the prescription drug market, with high barriers to entry, learned professional intermediation, and complicating relationships with insurance companies, the market for non-prescription drugs like antibacterial liquid hand soaps *is* highly competitive and efficient.

[17] Boedeker's use of conjoint analysis is also superior to the flawed damages methodologies proffered in *In re POM Wonderful LLC*, No. ML10-02199DDP (RZx), 2014 WL 1225184, at *4 (C.D. Cal. Mar. 25, 2014), to prove false labeling damages. In *POM*, the plaintiff's expert simply assumed that because POM Wonderful pomegranate juice cost more than the average price of an arbitrarily-selected benchmark group of orange, grape, apple, and grapefruit juices, then the price difference between the pomegranate juice and the benchmark must be attributable to the defendant's allegedly false health benefit representations. The district court rejected that proffered methodology, finding it to be based on the unsupported assumption that no consumer "would have chosen POM over some agglomeration of orange, grapefruit, apple, and grape juice if not for POM's allegedly deceptive advertising." *Id.* at *5. In contrast, here, Boedeker did not make any assumptions about consumer's choices and preferences. Instead, he designed and implemented a survey to discover what those preferences were and how they related to Dial Complete's price. Following that, Boedeker then statistically analyzed the data from those surveys to econometrically determine the price premium caused by Dial's false "Kills 99.99% of Germs" claim.

Court should grant Plaintiffs' amended motion for class certification and certify the classes

pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), appoint the proposed class

representatives as class representatives of the classes they respectively seek to represent, and

appoint Plaintiffs' Interim Class Counsel and Executive Committee as Plaintiffs' Class

Counsel.

Dated:  June 24, 2016                              Respectfully submitted,

                                                  /s/ Lucy J. Karl
                                                  Lucy J. Karl
                                                  NH Bar No. 5547
                                                  **SHAHEEN & GORDON, P.A.**
                                                  107 Storrs Street
                                                  Concord, New Hampshire   03302
                                                  Telephone:  (603) 225-7262
                                                  Facsimile:  (603) 225-5112
                                                  lkarl@shaheengordon.com

                                                  ***Plaintiffs' Interim Lead Counsel***

**Plaintiffs' Executive Subcommittee**

Richard J. Arsenault
**NEBLETT, BEARD & ARSENAULT**
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71309
Telephone: (800) 256-1050
Facsimile: (318) 561-2592
rarsenault@nbalawfirm.com

John R. Climaco
**CLIMACO, WILCOX, PECA,
TARANTINO & GAROFOLI CO.,
L.P.A.**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
jrclim@climacolaw.com

Adam J. Levitt
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Telephone: (312) 214-0000
Facsimile: (312) 214-0001
alevitt@gelaw.com

Charles E. Schaffer
**LEVIN, FISHBEIN, SEDRAN &
BERMAN**
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
cschaffer@lfsblaw.com

Eric D. Holland
**HOLLAND LAW FIRM**
300 North Tucker Boulevard, Suite 801
St. Louis, Missouri 63101
Telephone: (314) 241-8111
Facsimile: (314) 241-5554
eholland@allfela.com

## Plaintiffs' Steering Committee

Daniel E. Becnel, Jr.
**BECNEL LAW FIRM, LLC**
P.O. Drawer H
106 West Seventh Street
Reserve, Louisiana 70084
Telephone: (985) 536-1186
Facsimile: (985) 536-6445
dbecnel@becnellaw.com

Christopher M. Ellis
**BOLEN ROBINSON & ELLIS, LLP**
202 South Franklin, 2nd Floor
Decatur, Illinois 62523
Telephone: (217) 429-4296
Facsimile: (217) 329-0034
cellis@brelaw.com

Jordan L. Chaikin
**CHAIKIN LAW FIRM PLLC**
12800 University Drive, suite 600
Fort Myers, Florida 33907
Telephone: (239) 470-8338
Facsimile: (239) 433-6836
Jordan@chaikinlawfirm.com

David C. Rash
**RASH LAW OFFICE**
2200 North Commerce Parkway, Suite 200
Weston, Florida 33326
Telephone: (954) 529-2222
Facsimile: (954) 529-2224
david@dcrashlaw.com

James C. Shah
**SHEPHERD, FINKELMAN, MILLER & SHAH, LLC**
35 East State Street
Media, Pennsylvania 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
jshah@sfmslaw.com

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that, on June 24, 2016, she caused this document to be filed via CM/ECF.

Dated: June 24, 2016

By: <u>/s/ Lucy J. Karl</u>
Lucy J. Karl
NH Bar No. 5547
